CLERKS OFFICE U.S. DIST. COURT
LYNCHBURG, VA
FILED

February 02, 2026

LAURA A. AUSTIN, CLERK
: BY: /s/  B. McAbee
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

| | |
|---|---|
| TIMOTHY W.,[1] ) | Civil Action No. 6:25-CV-00008 |
| ) | |
| Plaintiff, ) | |
| ) | REPORT & |
| v. ) | RECOMMENDATION |
| ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY ADMINISTRATION, ) | By: C. Kailani Memmer |
| ) | United States Magistrate Judge |
| Defendant. ) | |

Plaintiff Timothy W. (Timonthy), by counsel, filed this action challenging the final decision of the Commissioner of Social Security (Commissioner) finding him not disabled and therefore ineligible for disability insurance benefits (DIB) and supplemental security income (SSI).  This case is before me by referral pursuant to 28 U.S.C. § 636(b)(1)(B). Neither party has requested oral argument; therefore, this case is ripe for decision.

Having considered the administrative record, the parties' filings, and the applicable law, I find that the administrative law judge's (ALJ) decision is supported by substantial evidence. Accordingly, and for the reasons detailed below, I respectfully recommend the presiding District Judge affirm the Commissioner's final decision.

## BACKGROUND

### I.      Procedural History

On August 24, 2022, Timothy filed for DIB alleging a disability beginning on July 8, 2022. R. 223-27. On September 12, 2022, Timothy filed for SSI alleging a disability

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

beginning on July 11, 2022. R. 230-39.  His claims were initially denied on March 3, 2023, and again upon reconsideration on February 2, 2024. R. 119, 132. On February 5, 2024, Timothy requested an ALJ hearing, which was held on August 13, 2024. R 140-45, 41. Timothy was represented by counsel at the ALJ hearing. R. 43. Mr. Harry Tanzey testified as an impartial vocational expert. R. 71-82. On September 24, 2024, the ALJ issued an "Unfavorable Decision" analyzing Timothy's claims under the familiar five-step process,[2] finding him not under a disability from July 8, 2022,[3] through the date of decision, and denying his claims for benefits. R. 8-28.  Timothy's appeal to the Appeals Council was denied on December 18, 2024. R. 35. This appeal followed.

## II.    Medical History

Timothy was born in 1981 and has a high school education. R. 223, 49. In summary,   from November 2, 2015, to August 21, 2022,[4] Christiana Spine Center

---

[2]    The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to the claimant's past relevant work; and if not, (5) whether the claimant can perform other work. *Johnson v. Barnhart*, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); *Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. *Oakes v. Kijakazi*, 70 F.4th 207, 211 (4th Cir. 2023) (citing *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017)). At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity, considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); *Taylor v. Weinberger*, 512 F.2d 664, 666 (4th Cir. 1975).

[3]    There is a three-day discrepancy between Timothy's alleged disability onset day for his DIB (July 8, 2022) and SSI (July 11, 2022) applications. *See* R. 223-27, 230-39. The ALJ found Timothy not disabled from July 8, 2022, through the date of decision. R. 28. I find the ALJ committed a harmless error because the time period though which the ALJ evaluated Timothy's DIB claim was inclusive of the time period during which Timothy's SSI claim. Substantial evidence supports the ALJ's decision, so the ALJ's failure to address the different time periods is a harmless error. *See Drumgold v. Comm'r of Soc. Sec.*, 144 F.4th 596, 605 n.9 (4th Cir. 2025) (citing *Mascio v. Colvin*, 780 F.3d 632, 639–40 (4th Cir. 2015)) ("[w]e will not remand a case to the agency unless we not only see an error but find it harmful").

[4]    Because of the extensive and sometimes duplicative  nature of the medical records at Christiana Spine Center, only select medical records from Christiana Spine Center were summarized below.

treated Timothy's low back pain with bilateral selective nerve root blocks, prescription medications, orders for magnetic resonance imaging (MRI), referrals for physical therapy, and referrals for a surgical consultations.[5] R. 601, 605, 597, 593, 591, 585, 583, 465, 461, 459, 453, 574, 459, 446, 444, 439, 437, 432, 568, 430, 425, 423, 418, 413, 411, 406, 411, 533, 564, 527, 522, 520, 516, 513, 509, 507, 502, 500, 494, 488, 486, 480, 477, 471, 469, 645, 467, 556, 635, 548, 546, 539, 562, 613, 654, 538. Throughout his treatment at Christiana Spine Center , Timothy's prescriptions included Ibuprofen, 600 milligrams three times daily as needed; Meloxicam, 15 milligrams once daily for 30 days; Tizanidine, four milligrams three times daily for 15 days; and Methylprednisolone, four milligrams as directed on package for six days. R. 536-37, 528, 518, 543-44. At times, Timothy reported Meloxicam, Methylprednisolone, and Tizanidine reduced his pain level. *See, e.g.*, 419-20, 413, 527, 613.

On November 2, 2015, at his first appointment at Christiana Spine Center, Timothy presented to Nancy Kim, MD, for a back pain evaluation. R. 601. Timothy reported lumbar pain with radiation into the bilateral buttock and bilateral posterior thighs; he had a pain level of 3/10, but at its worst his pain level was 10/10; he had an achy and sharp pain, numbness, and tingling in the toes of both feet; bending over and prolonged standing exacerbated his pain; and laying down relieved his pain. R. 609. Upon examination, Dr. Kim found Timothy has 5/5 bilateral lower extremity strength,

---

[5] On July 23, 2018, and January 6, 2021, Dr. Kim referred Timothy to J. Rush Fisher, MD, for a surgical consultation for his back. R. 435, 484-85. However, on April 8, 2021, Timothy informed Dr. Kim that his insurance would not cover a surgical consultation with Dr. Fisher. R. 475-76. Also, on August 9, 2022, Dr. Kim referred Timothy to Delaware Neurosurgery for a surgical consultation for his back. R. 617-18. However, on September 10, 2021, Timothy shared he had not proceeded with the Delaware Neurosurgery referral because he did not have health insurance at the time, but he had health insurance at this appointment, and he planned on attending a surgical consultation with Delaware Neurosurgery. R. 645.

except in the right extensor hallucis longus which had a strength level of 4+/5; independently transferred from a seated position to a standing position, had a mild antalgic gait, and used no assistive device. R. 610. Dr. Kim's assessment was that Timothy had recurrent low back pain due to lumbar disc derangement at L3-L4, L4-L5, and L5-S1, and bilateral lower extremity radicular pain at L4-L5. R 611. Dr. Kim prescribed physical therapy and scheduled a lumbar epidural injection. R. 611. Dr. Kim noted Timothy was able to return to work on modified duty. *Id.* Timothy was largely unchanged throughout his care at Christiana Spine Center. *See, e.g.*, R. 447, 407-08, 528, 556, 614.

On November 6, 2015, Timothy presented to Dr. Kim, for a bilateral selective nerve root block. R. 605. Dr. Kim administered a bilateral selective nerve root block 10.00 cubic centimeters of Omnipaque, 1.0 cubic centimeters of 0.25% Marcaine, and 1 cubic centimeter of Kenalog 40 milligrams/milliliter at the left and right L5-S1. R. *Id.* Timothy was discharged in a satisfactory condition and scheduled for a follow-up in six weeks. R. 606. After this first bilateral selective nerve root block, Timothy received an additional 22 bilateral selective nerve root blocks approximately every three months until his last bilateral selective nerve root block at Christiana Spine Center on May 6, 2022. *See, e.g.*, R. 591, 583, 465, 459, 444, 437, 430, 423, 411, 520, 513, 507, 500, 486, 477, 469, 467, 635, 546. Timothy consistently noted the bilateral selective nerve root blocks reduced his pain level from 30% to 100%. *See, e.g.*, 425, 446, 522, 645.

On August 15, 2018, on a referral from Christiana Spine Center, Timothy presented to Alberto Iaia, MD, of Christiana Care Health Services, for an MRI of the lumbar spine and Parham Moftakhar, MD, of Christiana Care Health Services, for a

4

computerized tomography (CT) scan of the lumbar spine. R. 568, 572. Dr. Iaia's impressions of the MRI were Timothy had (1) a stable moderate right L5 nerve root encroachment in its lateral recess, secondary to a broad-based right paracentral protrusion at L4-L5; and (2) a stable mild bilateral S1 lateral recess stenosis and left L5 neural foraminal narrowing. *Id.* Dr. Moftakhar's impression of the CT scan was Timothy had small multilevel broad-based disc bulges/disc osteophyte complexes most prominent at L4-L5 where there is right-sided subarticular recess stenosis, which may have affected the traversing right L5 nerve root. R. 573.

On March 18, 2019, Timothy presented to Andrew Gelman, DO, of Delaware Orthopedic Specialists, for a physical examination. R. 578. Timothy reported a  lifting accident, on February 27, 2008, which resulted in pain in his lower back and left lower extremity; however, by mid-April 2008 Timothy reported he was doing well, did not report any pain, and had minimal symptoms. *Id.* Timothy also reported he threw an 80-pound Pitbull in April 2008 and had a motor vehicle accident on June 19, 2010. *Id.* Dr. Gelman concluded these incidents likely exacerbated Timothy's underlying degenerative diseases. R. 578-79. Dr. Gelman recommended a "conservative course of care and would not be an advocate with regards to operative treatment," R. 579, and Dr. Gelman also advised Timothy to take Ibuprofen as needed, schedule pain management injections, and engage in at-home exercise and stretches. R. 579.

On June 24, 2019, Timothy presented Anton Delport, MD, of Christiana Spine Center, for an MRI of the lumbar spine. R. 564. Dr. Delport's impressions of the MRI were that Timothy had (1) a stable broad-based disc protrusion, partially improved annular fissure at L4-L5, a stable right greater than the left lateral recess stenosis, and

mild right foraminal narrowing; (2) stable degenerative disc disease at L5-SI, mild lateral recess stenosis, and mild left foraminal narrowing; and (3) stable central and left paracentral inferior annular fissure at L2-L3 without central canal or foraminal narrowing. R. 566.  On August 1, 2022, Timothy presented Dr. Delport for an MRI of the lumbar spine. R. 562. Dr. Delport's impression of the MRI of the lumbar spine was (1) degenerative disc disease at L5-S1, including a loss of disc height, vacuum disc, mixed degenerative endplate changes that have evolved and a disc osteophyte complex that is eccentric to the left, and a mild lateral recess narrowing and mild to moderate left foraminal narrowing; (2) degenerative disc disease at L4-L5 that resulted in stable right greater than left lateral recess stenosis and mild right foraminal narrowing; and stable central and left paracentral inferior annular fissure at L2-L3 without central canal or foraminal narrowing. *Id*.

On August 18, 2022, Jeffrey Myers, physician assistant certified (PA-C), of Christiana Spine Care, provided Timothy with a work note that stated he was able to return to work with modified duty on August 18, 2022, but he must be on sedentary duty and able to sit and stand at his discretion, and he cannot bend, twist, squat, push, pull, climb, or kneel; he also cannot sit for more than 30 minutes, stand for more than 30 minutes, or walk for more than 30 minutes. R. 654.

On October 26, 2022, Timothy presented to Sean Gannutz, physician assistant (PA), of Carilion Clinic, to establish care and discuss medications and referral. R. 763. Upon examination, PA Gannutz found in the musculoskeletal system there was no swelling or deformity, and in the lower extremities there was no clubbing, cyanosis, or edema; he had a full range of motion in his back and low back tenderness along the

lumbar spine from L1-S1. R. 763. PA Gannutz assessed Timothy had a history of degenerative disc disease and herniated intervertebral disc disease. R. 764. PA Gannutz continued his prescriptions and referred him for spine surgery. R. 766.

On November 11, 2022, Timothy presented to George Godette, MD, of Carilion Clinic Orthopedics, and complained of lower back pain for 15 years. R. 661. Timothy also requested epidural steroid injections every three months. *Id.* Upon examination, Dr. Godette found Timothy was not in acute distress; stood up from a chair without using his arms; performed a toe walk, a heel walk, and squatted without issue; 70 degrees of forward flexion and 10 degrees of extension; an equivocal straight leg raise on the right and a positive straight leg raise on the left. *Id.* Dr. Godette concluded Timothy had persistent disc herniation at L5-S1 that may place pressure on the exiting nerve root on the left. R. 662. Dr. Godette prescribed Prednisone and agreed to provide an epidural steroid injection. *Id.*

On January 25, 2023, Timothy presented to Jared Davis, MD, of Augusta Health, for a bilateral transforaminal epidural steroid injection at L5-S1 with Depo-Medrol, 40 milligrams, and 0.25% Bupivacaine, four milliliters. R. 667. Timothy tolerated the procedure well and had no immediate complications. *Id.*

On April 25, 2023, Timothy presented to PA Gannutz for pain management. R. 758. Timothy requested a referral to Augusta Health for pain management injections. *Id.* Upon examination, PA Gannutz found there was no obvious tenderness in his back, and he was not in acute distress. *Id.* PA Gannutz referred Timothy to Augusta Health Spine Center for spinal injections. R. 758-59.

7

On June 7, 2023, Timothy presented to Dr. Godette for a follow-up appointment on low back pain. R. 695. Timothy walked with an antalgic gait. *Id.* Upon examination, Dr. Godette noted Timothy was not in acute distress; had difficulty rising from a chair without using his arms; performed a toe walk without difficulty; had difficulty with a heel walk; performed a squat; had a positive straight leg raise; and had weakness in the hip flexion on the left but not on the right. *Id.* Dr. Godette assessed Timothy had a herniated nucleus pulposus at L5-S1; was unable to perform his work as a concrete finisher; recommended an MRI; and scheduled a follow-up appointment. R. 696.

On June 19, 2023, on an order from Dr. Godette, Timothy presented to David Feigal, MD, of Carilion Clinic, for an MRI of the lumbar spine. R. 704. Dr. Feigal's impression of the MRI was Timothy had moderate advanced L5-S1 predominant multilevel degenerative spondylotic disc and facet disease of the lumbar spine. R. 706.

On June 17, 2023, Dr. Coggins wrote a letter stating Timothy is "unable to work indefinitely." R. 712.

On June 23, 2023, Timothy presented to Dr. Godette for a follow-up appointment on low back pain and reported difficulty arching his back. R. 697. Timothy reported he had little relief from non-steroidal anti-inflammatory medicines. R. 698. Dr. Godette's impression of the MRI was Timothy had significant degenerative disc disease with acute and chronic herniated nucleus pulposus at L5-S1 on the left with some impingement on the ventral surface of the spinal cord. R. 698. Dr. Godette counseled Timothy that a simple discectomy/laminectomy would likely not be sufficient to address Timothy's degenerative disc disease; referred him to Mark Coggins, MD, of Carilion Clinic

Orthopedic Surgery for treatment options; and noted that "The patient works concrete and will not be thrilled about being off of work for 6 months." *Id.*

On July 7, 2023, on referral from Dr. Godette, Timothy had an appointment with Dr. Coggins and complained of back pain of 5/10 and leg pain of 5/10. R. 713. Timothy reported his pain worsened with sitting, standing, walking, lifting, twisting, bending, exercise, and prolonged activities. *Id.*  Timothy reported epidural steroid injections had become less effective, and anti-inflammatories did not help. *Id.* Upon examination, Dr. Coggins found Timothy displayed a mild to moderate antalgic gait on the left; dorsalis pedis pulses were 2+ bilaterally; no pain in the groin on passive motion bilaterally; mild to moderate distress; straight right leg raises caused right low back pain; straight left leg raises caused moderate left low back pain; Hoffman sign was negative bilaterally; there was no clonus at either ankle; there was mild midline tenderness at L5-S1; there was bilateral posterior superior iliac spine tenderness; and active flexion was restricted to 60 degrees; and there was severe low back pain with lumbar extension. R. 715. Based on X-rays, Dr. Coggins found Timothy had severe L4-5 and L5-S1 degenerative disc space narrowing and instability on the flexion and extension in the lateral lumbar region. R. 715. Based on the most recent MRI, Dr. Coggins noted degenerative signal changes from L1-2 through L5-S1, modic endplate changes at L4-5 and L5-S1; a central annular tear at L1-2 without nerve compression; central and left annular tear at L2-3 with a protrusion contacting the left L3 nerve without significant compression; small central annular tear at L3-4 without nerve compression; right paracentral disc protrusion at L4-5 causing right L5 nerve compression in the lateral recess; lesser lateral recess narrowing on the left at L4-5; bilateral L4-5 facet arthropathy; and central disc protrusion with left-sided

annular tear at L5-S1. R. 715. Dr. Coggins' assessment was Timothy had lumbar degenerative disc disease, bilateral lumbar radiculopathy, and lumbar spondylosis. R. 726. Dr. Coggins recommended Timothy not pursue surgery in the back or legs; found he did not have instability; recommended Gabapentin or Lyrica; and referred him to Agusta Pain Management. *Id.*

On September 28, 2023, on a referral from Dr. Coggins, Timothy presented to Stanley Hatcher, nurse practitioner (NP), of Augusta Pain Management. R. 812. Timothy reported he had bilateral back aching, stabbing, and sharp back pain; a pain level of 5/10 and at its worst a pain level of 10/10; weakness, numbness, tingling, and radiation down the leg. R. 813. Upon examination, NP Hatcher found Timothy had a normal gait; lower extremity sensation; and grossly intact lower extremity motor strength. R. 814. NP Hatcher's assessment was Timothy had chronic low back pain, lumbosacral spondylosis without myelopathy, and lumbar radiculopathy. *Id.* NP Hatcher continued Timothy's prescriptions; found nonsteroidal anti-inflammatory drugs and physical therapy inadequately managed his pain; scheduled a diagnostic bilateral L4, L5, SA medial branch block; and discharged him with no red flag signs or symptoms. R. 814.

On January 4, 2024, Timothy presented to Kevin Greer, MD, of Augusta Health, for a bilateral lumbar medial branch nerve block. R. 816. Dr. Greer administered 0.5 milliliters of 1% Lidocaine and 0.5 milliliters of 0.5% Bupivacaine. R. 817. Dr. Greer noted Timothy tolerated the procedure well, and there were no immediate complications. *Id.*

On January 11, 2024, Timothy presented to NP Hatcher. R. 801. Timothy reported muscle aches and back pain but no muscle weakness, but he reported weakness and numbness in his legs. R. 802. Upon examination, NP Hatcher noted Timothy had a normal gait; grossly intact lower extremity motor strength; and lower extremity sensation. *Id.* NP Hatcher's assessment was Timothy had chronic low back pain, lumbosacral spondylosis without myelopathy, and lumbar radiculopathy. R. 802-03. NP Hatcher continued his medication and recommended Timothy follow-up with Dr. Coggins. R. 801, 802-03.

On January 17, 2024, Timothy presented to Dr. Godette for a follow-up appointment and reported his last medial branch block was not effective; he was out of Gabapentin; and he no longer worked. R. 798. Dr. Godette observed Timothy walked with a slightly antalgic gait. R. 798. Upon examination, Dr. Godette noted Timothy could rise from a chair without using his arms; he performed a toe walk and  a squat without issue; he had equivocal straight leg raises that caused pain to his back but not his legs; and his abduction and hip flexion strength were satisfactory. R. 798. Dr. Godette increased Timothy's Gabapentin to three times daily; prescribed anti-inflammatory medicine; referred him to pain management; and encouraged him to walk for exercise. R. 799.

On April 12, 2024, Timothy presented to NP Hatcher for neck pain. R. 804. Timothy reported his pain level was 5/10, but at its worst he had a 10/10 pain level. R. 805. He also had numbness, tingling, and radiation down the leg, but no leg weakness. *Id.*  Timothy also noted his neck pain started years ago, but his neck pain worsened recently. R. 805. Upon examination, NP Hatcher found Timothy was unchanged. *Id.*  NP

11

Hatcher continued his prescriptions; referred him to physical therapy; and instructed him to follow-up with Dr. Coggins. R. 806.

On May 14, 2024, on a referral from NP Hatcher, Timothy presented to Cory Prince, doctor of physical therapy (DPT), of Synergy Rehab and Wellness,[6] for an initial evaluation. R. 859. Timothy complained of chronic neck pain and low back pain, and his goal for physical therapy was to get his pain under control and return to pain free mobility. *Id.* He reported his back pain and neck pain were 8/10 with some incidents of 10/10 pain. *Id.* Timothy reported he could engage in community mobility, lifting, walking, and work activities with severe pain or difficulty. *Id.* DPT Prince's assessment was Timothy had significant range of motion loss due to pain in his upper cervical spine; strength deficits in his bilateral upper extremities; pain from his disc herniations; and muscle spasms in the neck caused by the disc herniations. R. 862. DPT Prince estimated a course of physical therapy of two times per week for eight weeks. R. 863.

From May 2024 through July 2024, Timothy completed eleven physical therapy sessions. R. 864, 869, 872, 875, 878, 880, 886, 889, 893, 895, 898. The physical therapists noted Timothy could perform the physical therapy exercises and had fair tolerance of the treatment. *See, e.g.*, R. 867, 873, 890. The physical therapists also noted Timothy improved in range of motion. R. 890, 893. Timothy reported he started out with a low back pain and neck pain level of 8/10, but at the end of his physical therapy he shared his low back pain level was 4/10, and his neck pain level was 3/10. R. 898.

---

[6] Because the medical records for Timothy's twelve physical therapy sessions at Synergy Rehab and Wellness are similar to one another, the medical records for Timothy's physical therapy sessions at Synergy Rehab and Wellness are briefly summarized below.

On June 5, 2024, Timothy presented to Alicia Devine, MD, of Carilion Clinic Emergency Department, for complaints of mid and left-side lower back pain. R. 827. Timothy was using a riding lawn mower when the wheel hit a hole and jolted him and caused a pop in his lower back. *Id.* Timothy was ambulatory since the lawn mower incident, but he had weakness (without numbness) in his lower extremities. *Id.* Upon examination, Dr. Devine found Timothy had a normal range of motion; tenderness in the lumbar back; no edema in the right lower leg or left lower leg; strength of 5/5 in the bilateral lower extremities; an antalgic gait; and ambulatory. R. 828. Dr. Devine's impression was acute left-sided low back pain and an acute muscle spasm. R. 829. Dr. Devine provided pain medication during the emergency department visit, and Timothy reported some improvement with his pain; found his condition was stable; discharged him from the emergency department; and instructed him to call the emergency department if his symptoms worsened. R. 828-29.

On June 11, 2024, Timothy presented to Amanda Collins, PA, of Carilion Clinic, and complained of back pain and leg pain. R. 842. Timothy reported lower back pain that radiated into the bilateral posterior legs down to the calf, numbness, tingling, and a pain level of 6/10. R. 842. Upon examination, PA Collins found Timothy ambulated without an assistive device; had a balanced gait; had no difficulty with transitional movements; had no significant misalignment or obvious bony deformity; a tender lumbar region; normal flexion and lateral bending range of motion; pain with flexion and extension; negative straight leg raises, which caused midline back pain; and normal sensations and reflexes. R. 843-44. PA Collins continued his medications;

recommended continued physical therapy; and ordered an MRI of the lumbar spine. R. 845.

On June 20, 2024, on an order from PA Collins, Timothy presented to Allison Boatman, MD, of Carilion Clinic, for a lumbar spine MRI. R. 825. Dr. Boatman's impression of the MRI were that Timothy had moderately advanced at L4-5 and L5-S1 and predominant multilevel degenerative spondylotic disc and facet disease of the lumbar spine. R. 826. Dr. Boatman found the MRI indicated chronic bilateral low back pain with bilateral sciatica and degenerative disc disease of the lumbar spine. *Id.*

On July 5, 2024, Timothy presented to PA Collins and complained of a pain level of 6/10. R. 836. Timothy reported he had no relief of symptoms from physical therapy. *Id.* Upon examination, PA Collins noted he had a balanced gait; 5/5 strength throughout the bilateral lower extremities; and negative straight leg raises, which caused pain. R. 837. PA Collins recommended continued pain management at Augusta Pain Management and a follow-up appointment in six weeks. R. 838.

### III.    Medical Opinions

On March 3, 2023, in the disability determination explanation at the initial level, Daniel Camden, MD, found Timothy had the following severe impairments: disorders of the skeletal spine and lumbar spinal stenosis. R. 88. Dr. Camden's residual functional capacity (RFC) noted the following limitations: (1) could occasionally lift and/or carry 20 pounds; (2) could frequently lift and/or carry 10 pounds;  (3) had a rating of unlimited for push and/or pull—except for lifting and/or carrying—with the upper and lower extremities; (4) could stand and/or walk with normal breaks for four hours; (5) could sit with normal breaks for six hours in an eight hour workday; (6) could

occasionally climb ladders/ropes/scaffolds and stoop; (7) had a rating of unlimited to climb ramps/stairs, balance, kneel, and crouch; (8) had a rating to frequently crawl; (9) had no limitations for manipulation, vision, and communication; (10) had a rating of unlimited for exposure to extreme hot, wetness, humidity, noise, and fumes, odors, dusts, gases, and poor ventilation; and (11) had a rating of should avoid concentrated exposure with extreme cold, vibration, and hazards. R. 89-90. To accommodate Timothy's limitations, Dr. Camden limited him to sedentary work, but Dr. Camden concluded Timothy was not disabled. R. 91.

On February 1, 2024, in the disability determination explanation at the reconsideration level,[7] Joseph Leizer, Ph.D., found Timothy's anxiety and obsessive-compulsive disorders were "non-severe." R. 104. Dr. Leizer determined Timothy had mild limitations for the following mental functions: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. R. 105. Dr. Leizer concluded Timothy did not have a severe mental health impairment. R. 105.

Also, on February 1, 2024, in medical portion of the disability determination explanation at the reconsideration level, Jack Hutcheson, Jr., MD, determined Timothy's RFC included the following limitations: (1) could occasionally lift and/or carry 10 pounds; (2) could frequently lift and/or carry 10 pounds; (3) had a rating of unlimited for push and/pull—except for lifting and/or carrying—with the upper and lower extremities; (4) could stand and/or walk with normal breaks for four hours; (5)

---

[7] As Dr. Leizer noted, Timothy did not allege mental conditions, and Timothy's mental conditions were not addressed at the disability determination explanation at the initial level, but his mental conditions were evaluated at the disability determination explanation at the reconsideration level. R. 105.

could sit with normal breaks for six hours in an eight hour workday; (6) could frequently balance; (7) could occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl; (7) could never climb ladders/ropes/scaffolds; (8) had no limitations for manipulation, vision, and communication; (9) had a rating of unlimited exposure to extreme heat, wetness, humidity, noise, and fumes, odors, dusts, gases, and poor ventilation; (10) had a rating of should avoid concentrated exposure to extreme cold, vibration, and hazards. R. 106-07. Dr. Hutcheson agreed with Dr. Camden that Timothy should be limited to sedentary work and was not disabled. R. 108.

## VI.    Administrative Hearing

On August 13, 2024, the ALJ held a hearing. R. 41. The ALJ held the record open for 14-days to allow Timothy's counsel to submit additional medical records.[8] R. 45-46.

Timothy testified he had sharp shooting pain in the back and legs and toe numbness, which can last for an hour. R. 51-52. He indicated his back and leg pain prevented him from engaging in household chores, such as sweeping and mopping, but he could still straighten up the house. R. 50-51. Timothy testified he could no longer use a riding lawn mower or a weed eater because of his pain. R. 67-68. To perform daily chores, Timothy had to move slowly to limit the sharp and shooting pain that hit his nerve and went down his leg. R. 67.

Timothy testified he had four to five bad days a week and sometimes had better days. R. 52. Timothy reported he had difficulty sleeping and would wake up four-six times per night and would wake up with sharp and shooting pain. R. 53. Timothy's

---

[8]    On August 30, 2024, Timothy's counsel wrote to the ALJ to request an additional 30-days to submit records from Synergy Rehab and Wellness. R. 397. Eventually, the medical records from Synergy Rehab and Wellness were accepted into the record. *See* R. 859-904.

interrupted sleep pattern made him feel less energetic. R. 64. Timothy noted he could stand for no longer than 15-20 minutes and could walk for no longer than 25 minutes before he felt stiffness. R. 53-54. Timothy took medications, applied heat, sat down in a recliner, and got off his feet to address his back and leg pain. R. 54. Timothy spent approximately five hours in his recliner, but he must get up from his recliner every 30-40 minutes. R. 63-64.

Timothy testified the medication made him feel "loopy" as if he "had one too many beers." R. 54. According to Timothy, the "loopy" feeling started 30-40 minutes after he took his medications and lasted for approximately an hour thereafter. *Id.* Timothy said he did not drive after he takes his medications. R. 55, 65. However, Timothy noted his medications helped with his leg pain and nerve pain. R. 54.

Timothy testified he could no longer ride all-terrain vehicles, and he experienced pain when he went hunting. R. 57. When Timothy tried to work on the brakes of a vehicle, he experienced difficulties because of getting up and down, turning, twisting, and bending, and something fell into his eye[9] while working on the vehicle's brakes. R. 58. After working on the brakes, Timothy felt a dull and aching pain the following day. R. 70.

In Timothy's previous job, he worked as a concrete finisher for roads and bridges. R. 58-59. Timothy also operated a jackhammer to break concrete, shoveled the broken concrete, formed the concrete, and re-poured the concrete. R. 59. Timothy testified his previous job required lifting of up to 100 pounds. *Id.* Timothy reported he had

---

[9]    On September 2, 2023, Timothy presented to Jennifer Dameron, registered nurse, of Rockbridge Hospital, and complained of something falling into his right eye when he was repairing brakes the day before. R. 719. RN Dameron's assessment was there was no corneal abrasion, ulcer, or foreign body identified; performed a Morgan's lens irrigation; instructed him to follow-up with his primary care physician; and discharged him. R. 720.

difficulties with performing his job because bending became challenging; he became more short-tempered; and he could not maintain pace at his work. R. 59.

When the ALJ inquired about whether Timothy could work eight-hours sitting at a desk, Timothy replied he could not work for eight-hours sitting at a desk because he would experience stiffness as well as sharp and shooting pain. R. 60. Timothy reported he could sit in a chair for no more than 30 minutes. *Id.* As a result, Timothy alternated between sitting, standing, and moving around. *Id.* Also, Timothy stated he would have difficulties with a desk job "like typing" because all the tendons were cut in one of his hands when he fell through a window. R. 60-61.

According to Timothy, his pain interfered with his ability to concentrate at work and caused him frustration and anger. R. 61-62. Timothy's pain led him to have verbal outbursts and reduced his productivity at work. R. 62. Given that Timothy was no longer working, he did not need to bend over or twist his body for work, so his pain levels were not as high as when he worked. R. 62-63.

Timothy testified he had at least ten injections for his back pain and physical therapy. R. 65. According to Timothy, Dr. Coggins diagnosed him with degenerative disc disease, and Dr. Coggins warned Timothy that surgery could worsen his back and necessitate additional surgeries. R. 65-66. Dr. Coggins noted Timothy could not return to work. R. 66-67. Also, Timothy testified a neurosurgeon in Roanoke, Virginia, recommended a spinal fusion surgery. R. 66.

Vocational expert Mr. Tanzey testified that Timothy's prior work was classified as a concrete finisher, which required a heavy level of exertion and was a skilled position. R. 73. Mr. Tanzey concluded a person could not perform Timothy's past work provided

that this person had the same age, educational level, and past work experiences as Timothy; could not climb ladders, ropes, and scaffolds; could occasionally crawl, crouch, kneel, stoop, and climb ramps and stairs; could frequently balance; must avoid concentrated exposure to extreme cold; could not work around hazards, such as exposed high places and unprotected moving mechanical parts and vibrating tools or machinery; and could not operate a motor vehicle as part of work. R. 73-74.

Mr. Tanzey testified that a person who was the same as Timothy could work as an assembler, textile worker, and office helper. R. 74. According to Mr. Tanzey, even if a person who was the same as Timothy was limited to standing or walking for four hours out of a workday, then that person could still work as an assembler, textile worker, and office helper. *Id.* Mr. Tanzey based this conclusion on his education, experience, training, and observation of assemblers and textile workers performing their job duties. R. 75-76.

If a person who was the same as Timothy was restricted to lifting no more than ten pounds, then this person would be limited to sedentary work, and this person could perform work as an optical assembler, toy and equipment assembler, and account clerk. R. 76-77. Mr. Tanzey concluded a person could not perform sedentary work or any type of work if this person, who was the same as Timothy, had the following limitations: could stand or work for no more than 30-minutes before needing to alternative to sitting for 10-minutes before they could resume standing and walking; could only sit for 30-minutes at a time before needing to alternative to standing and walking for five-minutes before this person would resume sitting; and was off task or away from the workstation while resting in between sitting and standing. R. 77. Mr. Tanzey testified this

19

hypothetical person could not find work because this hypothetical person would be off task for an excessive amount of time during the workday. R. 78. Also, if a person missed one to two days of work per month on a sustained basis, then this person could not find full-time and competitive employment. *Id.* Moreover, Mr. Tanzey testified a hypothetical person could not find light or sedentary employment if this hypothetical person could not bend, twist, squat, push, pull, climb, or kneel, and had to alternative between sitting and standing at their discretion. R. 78-79.

## **ALJ FINDINGS**

At the first step, the ALJ found Timothy had not engaged in substantial gainful activity since July 8, 2022. R. 13. At the second step, the ALJ found Timothy had the following severe impairment: degenerative disc disease. R. 14. At step three, the ALJ found Timothy did not have an impairment or combination of impairments that meet or medically equal the severity of one of the listed impairments. R. 15.

The ALJ concluded Timothy had the RFC to perform light work[10] with the following limitations:

> [T]he claimant can only stand or walk a total of four (4) hours in an eight-hour workday. The claimant cannot climb

---

[10] Light work is defined in the following way:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967(b).

> ladders, ropes, or scaffolds and can only occasionally crawl, crouch, kneel, stoop, and climb ramps or stairs. The claimant can frequently balance, as the term is defined in the Dictionary of Occupational Titles. The claimant should avoid concentrated exposure to extreme cold. The claimant cannot work around hazards, such as exposed high places and unprotected moving mechanical parts and cannot work with vibrating tools or machinery or on vibrating surfaces. The claimant cannot operate a motor vehicle as part of work.

R. 15-16. At step four, the ALJ determined Timothy was unable to perform any past relevant work. R. 26. At step five, based on the testimony of Mr. Tanzey, the ALJ identified the following jobs, which exist in significant numbers in the national economy, Timothy can perform: (1) assembler, (2) textile worker, and (3) office helper. R. 26-28. Thus, the ALJ determined Timothy was not disabled from July 8, 2022, the alleged onset date, through September 24, 2024, the date of the ALJ's decision. R. 28.

## STANDARD OF REVIEW

In reviewing the merits of the Commissioner's final decision, judicial review is limited to assessing whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 94 (4th Cir. 2020). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citation modified); *see also Biestek v. Berryhill*, 587 U.S. 97, 103, (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations,

or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589).

Further, remand is appropriate if the ALJ's analysis is so deficient that it "frustrate[s] meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (noting that "remand is necessary" where the court is "left to guess [at] how the ALJ arrived at his conclusions"). ALJs must not only reach a conclusion supported by substantial evidence but must also "build an accurate and logical bridge from the evidence to their conclusions." *Arakas*, 983 F.3d at 95.

## **DISCUSSION**

Timothy presents two assignments of error. First. Timothy asserts substantial evidence does not support the ALJ's decision. (ECF No. 10, at 3.) Second, Timothy argues the ALJ failed to consider and evaluate the credibility of his testimony at the ALJ hearing. (*Id.* at 15-20.) The Commissioner responds that substantial evidence supports the ALJ's decision, and the ALJ appropriately considered and evaluated Timothy's testimony. (ECF No. 11, at 6-14.) In a reply brief, Timothy contends the ALJ failed to consider the entire case record,[11] and the ALJ did not consider his testimony, so the court cannot meaningfully review the ALJ's decision. (ECF No. 14, at 1, 3.)

### I.    **Substantial evidence supports the ALJ's decision**

As noted above, Timothy asserts substantial evidence does not support the ALJ's decision. (ECF No. 10, at 3.) For the reasons below, I disagree.

---

[11] As discussed below, the court finds the ALJ appropriately considered the entire case file by comprehensively reviewing all the evidence. *See* R. 16-26.

Here, the court finds substantial evidence supports the ALJ's decision, and the ALJ provided a logical bridge from the evidence to his conclusions. *See Arakas*, 983 F.3d at 94-95. The ALJ comprehensively reviewed the medical and non-medical evidence. R. 16-26. The ALJ reviewed Timothy's function reports where he alleged his injuries prevented him from walking,[12] sitting, bending, twisting, standing, squatting for extended periods of time. R. 16. The ALJ acknowledged Timothy's allegations he at times needed help to put on his shoes and socks, did not prepare meals, and could not perform household chores or yardwork. *Id*. However, the ALJ noted Timothy's function reports shared he was regularly able to visit church, medical appointments, his child's school, gas station, and convenience store. *Id*. The ALJ also observed Timothy reported he continued to drive. *Id*.

The ALJ determined Timothy's medically determinable impairment—degenerative disc disease—could reasonably be expected to cause the alleged symptoms. R. 17; *see also* 20 C.F.R. §§ 404.1529, 416.929. However, the ALJ found Timothy's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence." R. 17; *see also* 20 C.F.R. §§ 404.1529, 416.929. The ALJ appropriately and extensively reviewed the evidence, including medical evidence, Timothy's testimony, and medical opinion evidence. R. 17-26.

---

[12] Remand may be appropriate where an ALJ failed to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where the ALJ's lack of analysis frustrates meaningful review. *See Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013) (per curiam)); *see also* SSR 96-8p, 1996 WL 362207, at *34477 (July 2, 1996) ("[e]xertional capacity addresses an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately"). However, Timothy did not make an assignment of error based on the argument the ALJ should have conducted a function-by-function analysis of his ability to sit, stand, walk, lift, carry push, and pull. (ECF No. 10, at 1-21.) The court declines to *sua sponte* raise this issue.

The ALJ observed Timothy reported Dr. Kim's bilateral selective nerve root block injections were effective at reducing his pain levels: a 70% reduction in pain levels in April 2017; a 80% reduction in pain levels in September 2017; a 100% reduction in pain levels in May 2018; and a 80%-90% reduction in pain levels from August 2018 through May 2022. R. 17-19. The ALJ noted that in April 2017 Dr. Kim recommended Timothy could return to working full duty. R. 17. The ALJ reviewed Dr. Kim's findings and impressions of an MRIs of Timothy's lumbar spine. R. 18-19.

The ALJ reviewed Dr. Gelman's observation, in March 2019, that Timothy appeared comfortable and transferred on to and off of the examination table without difficulty R. 18. However, the ALJ also acknowledged Dr. Godette's observations in June 2023 that Timothy had difficulty rising from a chair without using his arms and had difficulty walking on his heels. R. 20. As the ALJ observed, Dr. Godette advised simple discectomy/laminectomy would most likely not be sufficient to help Timothy, so Timothy may need a more extensive decompression and fusion surgery. R. 21. Also, the ALJ inferred—based on Dr. Godette's treatment notes that Timothy did not want to take time off from work—Timothy continued to work after the alleged disability onset date. *Id.* The ALJ contrasted Dr. Godette's recommendation for decompression and fusion surgery with Dr. Coggins,[13] who "did not recommend a fusion procedure" or "surgery for the leg pain." *Id.* Instead, Dr. Coggins recommended Gabapentin or Lyrica, medial branch nerve blocks, and a facet ablation at L4-L5 and L5-S1. *Id.* In January 2024, Dr.

---

[13] At the start of the final paragraph on R. 21, the ALJ refers to Dr. Coggins, but in the middle of that paragraph the ALJ mistakenly refers to Dr. Collins. Based on the context, this paragraph in the ALJ's decision refers to Dr. Coggins, not PA Collins. R. 21.

Godette also recommended Timothy take Gabapentin, an anti-inflammatory medication, and walk for exercise. R. 22.

The ALJ reviewed Timothy's 2024 physical therapy records that showed Timothy made some improvements, including an increased range of motion and decreased pain levels in the back and legs. *Id.* Also in 2024, the ALJ evaluated Timothy's emergency department visit after he had a muscle spasm while using a riding lawn mower, and Dr. Devine noted he was ambulatory, had tenderness in the lumbar region, normal strength in the lower extremities, and multilevel disc space narrowing, disc bulging, and bilateral neural foraminal narrowing at multiple levels. *Id.* However, Dr. Devine found no acute fracture or dislocation, and Timothy improved with pain medication. *Id.* Additionally, ALJ reviewed a June 2024 MRI that showed moderately advanced L4-L5 and L5-S1 predominant multilevel degenerative spondylotic dis and facet disease. *Id.* Moreover, the ALJ reviewed Timothy's medical records from his pain management provider, NP Hatcher, who found he had low back pain with bilateral sciatica, lumbar degenerative disc disease, a normal gait, a tender lumbar region, and normal strength and no sensory deficits in the bilateral lower extremities. R. 23.

As discussed in greater detail below, the ALJ's RFC assessment appropriately discussed and evaluated the credibility of Timothy's testimony. R. 24. Because the ALJ appropriately explained why he found Timothy's testimony to be partially credible, the court will not disturb the ALJ's credibility determination. *See Angela S. v. Comm'r of Soc. Sec. Admin.*, No. 7:23-CV-00228, 2024 WL 5103413, at *6 (W.D. Va. Dec. 13, 2024) (quoting *Harris v. Kijakazi*, No. 21-1853, 2022 WL 2987928, at *1 (4th Cir. July 28, 2022)) (noting "factual findings rest upon credibility determinations, [and] they should

be accepted by the reviewing court absent exceptional circumstances") (internal quotation marks omitted).

The ALJ appropriately considered the consistency and supportability factors[14] when determining the persuasiveness of the medical opinions of Dr. Leizer, Dr. Camden,[15] Dr. Hutcheson, PA-C Myers, Dr. Kim, and Dr. Coggins.[16] R. 24-26; *see also* (1) supportability and (2) consistency. 20 C.F.R. § 404.1520c(b)(2), 416.920c(c)(b)(2). For example, the ALJ found Dr. Hutcheson's medical opinion regarding Timothy's limitations were only partially consistent and supported by the medical and non-medical evidence in this case. R. 25. Also, it is notable that the ALJ's RFC limitations incorporated Dr. Camden's finding that Timothy should be limited to no more than four hours of standing or walking in a workday. R. 25, 15-16. Moreover, the ALJ properly explained how he reconciled contradictory evidence in the record. R. 23-26; *see Mascio*, 780 F.3d at 636 (quoting *Cichocki*, 729 F.3d at 177).

In conclusion, there is sufficient relevant evidence such that a reasonable mind might accept the ALJ's findings, so substantial evidence supports the ALJ's decision. *See*

---

[14] "Supportability roughly means the amount of objective medical evidence supporting the medical opinion, and consistency roughly means how well the medical opinion lines up with other material in the record." *Drumgold*, 144 F.4th at 605–06.

[15] The ALJ noted that Dr. Camden found Timothy should be limited to light work. R. 25. Dr. Camden opined, "[c]laimant would be capable of limited light work." R. 88. However, later in his medical opinion, Dr. Camden opined Timothy should be limited to sedentary work. R. 91. Pursuant to the harmless error doctrine, courts "will not remand a case to the agency unless we not only see an error but find it harmful." *Drumgold*, 144 F.4th at 605 n.9 (citing *Mascio*, 780 F.3d at 639–40). Because substantial evidence supports the ALJ's ultimate determination of non-disability, the court finds the ALJ's misstatement is a harmless error. Also, Timothy did not raise this issue as an assignment of error, and the court declines to *sua sponte* raise this issue.

[16] The ALJ concluded Dr. Coggins' letter, R. 712, is not a medical opinion, so the ALJ did not evaluate Dr. Coggins' letter as a medical opinion. R. 25. Timothy did raise the ALJ's finding about Dr. Coggins' letter as an assignment of error. (ECF No. 10, at 1-21.) Thus, the court declines to *sua sponte* raise this issue.

26

*Craig*, 76 F.3d at 589. Moreover, the ALJ's nine pages of discussion, R. 17-26, provides a logical bridge sufficient to pass muster. *See Arakas*, 983 F.3d at 95.

## II.    The ALJ appropriately considered and evaluated the credibility of Timothy's testimony

Next, as noted above, Timothy argues the ALJ failed to consider and evaluate the credibility of his testimony at the ALJ hearing. (ECF No. 10, at 15-20.) However, Timothy is in error. The ALJ appropriately considered and evaluated the credibility of Timothy's testimony:

> In considering the claimant's testimony about pain and difficulty with sustained walking and standing, I find that the record is only somewhat supportive of the degree of restriction alleged. The claimant otherwise remains capable of standing and walking for up to four hours in an eight-hour workday. Due to pain from his back, he must restrict work around hazards and vibrations. Side effects from medication necessitate that he avoid operation of a motor vehicle as part of work. Similarly, as extreme cold may exacerbate symptoms, he must limit exposure to such a condition. While he cannot climb ladders, ropes, or scaffolds, his balance has remained generally intact and he can occasionally engage in other postural activity as set forth in the residual functional capacity noted above.

R. 24. I find the ALJ appropriately reviewed Timothy's testimony. Also, based on Timothy's testimony, the ALJ made several accommodations for Timothy in the RFC. R. 15-16. Moreover, an ALJ's assessment of the credibility of a claimant's subjective complaints are afforded a high level of deference on review and are "virtually unreviewable" on appeal. *Darvishian v. Geren*, 404 F. App'x 822, 831 (4th Cir. 2010). Here, the court will not disturb the ALJ's reasonable credibility determination regarding Timothy's testimony.

As noted above, the court finds the ALJ made a credibility determination about Timothy's testimony, R. 24, and the court also observes that the ALJ conducted an in-person hearing, R. 43, where the ALJ had the opportunity to see Timothy and observe his behavior (for example, whether he walked with an antalgic gait). *See Stilwell v. Astrue*, No. 7:10-CV-00088, 2011 WL 2144637, at *1 (W.D. Va. May 31, 2011) (citing *Estep v. Richardson,* 459 F.2d 1015, 1017 (4th Cir.1972)) ("[t]he court gives deference to the ALJ's factual determinations and reviews them only for clear error"); *see also Horton v. Comm'r of Soc. Sec.*, No. 4:15-CV-00008, 2016 WL 1381839, at *9 (W.D. Va. Apr. 6, 2016) (quoting *Bishop v. Comm'r of Soc. Sec.*, 583 Fed. Appx. 65, 68 (4th Cir. 2014)) ("[a] reviewing court will defer to the ALJ's credibility determination except in "exceptional circumstances," such as, "where a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all") (internal citation omitted) (internal quotation marks omitted). The ALJ explained he found Timothy's testimony to be "somewhat supportive of the degree of restriction alleged." R. 24. In this case, I do not find there are exceptional circumstances that warrant the conclusion that the ALJ erred in his credibility determination about Timothy's testimony.

As noted above, the ALJ considered Timothy's function reports where he alleged his injuries prevented him from walking, sitting, bending, twisting, standing, squatting for extended periods of time, R. 16, and Timothy similarly testified that he had difficulties with getting up and down, turning, twisting, and bending. R. 58. Also, as discussed above, the ALJ acknowledged Timothy's allegations he at times needed help to put on his shoes and socks, did not prepare meals, and could not perform household

chores or yardwork, R. 16; moreover, Timothy testified he could not engage in household chores, such as sweeping and mopping, and daily activities. R. 50-51, 67-70.

The ALJ is not required to refer to every piece of evidence in the decision. *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (quoting *Dyer v. Barnhart,* 395 F.3d 1206, 1211 (11th Cir.2005) (per curiam)); *see also Collins on behalf of Collins v. Comm'r of Soc. Sec. Admin.*, No. CV 1:16-2929, 2017 WL 1739203, at *17 (D.S.C. Apr. 25, 2017), *report and recommendation adopted sub nom. Collins on behalf of Collins v. Comm'r of Soc. Sec.*, No. CV 1:16-2929, 2017 WL 1750276 (D.S.C. May 3, 2017) (recommending that the ALJ did not err by not specifically referencing a second function reports, even when the second function report was significantly different from the first function report, which was referenced in the ALJ's decision).

Here, I find the ALJ considered Timothy's testimony, R. 24, and the ALJ considered Timothy's subjective allegations in his function reports, which as discussed above, were substantially similar to Timothy's testimony. Thus, the ALJ fully considered Timothy's subjective allegations, so Timothy's argument that the ALJ failed to consider and evaluate the credibility of his testimony at the ALJ hearing, (ECF No. 10, at 15-20), is erroneous. *See Jeremy A. C. v. Kijakazi*, No. 3:21-CV-00007, 2022 WL 3146317, at *8 (E.D. Va. June 3, 2022), *report and recommendation adopted sub nom. Collins v. Kilolo*, No. 3:21-CV-007, 2022 WL 3137417 (E.D. Va. Aug. 5, 2022), *aff'd sub nom. Collins v. Kijakazi*, No. 22-1947, 2024 WL 1405894 (4th Cir. Apr. 2, 2024) (citing *Piney Mountain Coal Co. v. Mays*, 176 F.3d 753, 762 n.10 (4th Cir. 1999)) (noting the "ALJ need not discuss every piece of evidence in making credibility determination").

Also, Timothy cites to *Gull v. Barnhart*, No. 5:05-CV-00085, 2006 WL 1982769, at *5 (W.D. Va. July 14, 2006), for the proposition that the ALJ's failure to consider his testimony "resulted in a credibility analysis that is illogical and flawed, and thus remand is necessary." (ECF No. 10, at 16.) However, *Gull* and this case are distinguishable. In *Gull*, the ALJ discounted Gull's testimony because Gull attempted to work part-time, used non-prescription pain medications, failed to complete physical therapy, and did not require aggressive medical treatment. *Gull*, 2006 WL 1982769, at *5-7. In *Gull*, the court found the ALJ ignored medical opinion evidence that the claimant's right hand was non-functional, so the ALJ in *Gull* improperly placed too much emphasis on Gull's part-time work. *Id* at *6. The court faulted the ALJ for assuming without evidence that Gull should have taken prescribed medications to support a finding of disability. *Id.* The court found the ALJ failed to develop a sufficient  record to establish physical therapy would have remedied Gull's impairments, and the ALJ did not show Gull unreasonably refused physical therapy. *Id.* at *7. The court determined the ALJ should not have drawn a negative credibility inference because Gull did not receive aggressive treatment. *Id.* at *6. The court found the ALJ's reasoning in *Gull* was "flawed" and "illogical." *Id.* at *7 (quoting *Lester v. Chater,* 81 F. 3d 821, 834 (9th Cir. 1995)).

In contrast with *Gull*, the ALJ in Timothy's case did not ignore relevant evidence. As discussed above, the ALJ in this case engaged in a comprehensive review of the evidence. R. 16-26. Unlike in *Gull*, the ALJ considered Dr. Coggins and Dr. Godette's recommendations to take Gabapentin and Dr. Kim's administrations of bilateral selective nerve root block. R. 17-19. I do not find the ALJ improperly speculated about Timothy's medications. *See Dunn v. Colvin*, 607 F. App'x 264, 274–75 (4th Cir. 2015)

30

(holding the "ALJ can consider the conservative nature of a claimant's treatment in making a credibility determination"). Also, the ALJ in this case did not make a credibility determination based on Timothy's refusal to seek surgical interventions or on the absence of aggressive treatment. R. 16-26. The court finds this case is distinguishable from *Gull*. Also, in Social Security cases, the court does not re-weigh evidence. *Miller v. Bisignano*, No. 24-1014, 2025 WL 1409865, at *1 (4th Cir. May 15, 2025) (quoting *Shinaberry v. Saul*, 952 F.3d 113, 123 (4th Cir. 2020)). Timothy essentially requests the court to re-weigh evidence to reach a different credibility determination on Timothy's testimony. In this Social Security case, the court cannot and will not re-weigh the evidence supporting the ALJ's credibility determination about Timothy's testimony.

## CONCLUSION

The ALJ's opinion is supported by substantial evidence. Therefore, it is **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED** pursuant to the fourth sentence of 42 U.S.C. § 405(g), and the case be **DISMISSED** from the Court's active docket.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.

The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings, as well as to the conclusion reached by the undersigned, may be construed by any reviewing court as a waiver of such objection, including the waiver of the right to appeal. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

Entered: February 2, 2026

C. Kailani Memmer
United States Magistrate Judge

32